FILED
U.S. DISTRICT COURT
CEDAR RAPIDS HDQTRS OFFICE
NORTHERN DISTRICT OF IOWA

JUN 17 2005

By: _____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| GAZELLE VILLAGE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> NATIONAL BAPTIST CONVENTION, <br><br> Defendant. | No. C04-0016 <br><br> **ORDER** |

This matter comes before the court pursuant to defendant's April 1, 2005 motion for summary judgment (docket number 24) and plaintiff's May 5, 2005 motion to withdraw admissions (docket number 28). The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For reasons set forth below, defendant's motion for summary judgment is denied and plaintiff's motion to withdraw admissions is granted.

The plaintiff, Gazelle Village, Inc., ("Gazelle Village") claims that the defendant, National Baptist Convention USA, Inc., ("NBC USA") breached its contract with the Gazelle Village, under which Gazelle Village was to provide internet service to "all registering member churches" of NBC USA. NBC USA moves for summary judgment on Gazelle Village's claim, arguing that the undisputed facts establish, as a matter of law, that there was no "meeting of the minds" regarding the term "registering member churches" and thus, no contract exists. In its motion for summary judgment, NBC USA relies, in part, on admissions of Gazelle Village, which were "made" by Gazelle Village's failure to timely respond to NBC USA's requests for admissions pursuant to Fed. R. Civ. P. 36(a). Gazelle Village now moves to withdraw its admissions under Fed. R. Civ. P. 36(b).

1

NBC USA further argues that it is entitled to summary judgment on its counterclaim that it was Gazelle Village who breached the contract by refusing to transfer the domain name "nbcusa.net" back to NBC USA, along with the sign-in name and pass-code, upon the termination of the contract. NBC USA further seeks a declaratory judgment on various issues relating to the contract.

## MOTION TO WITHDRAW ADMISSIONS

On January 27, 2005, NBC USA served Gazelle Village numerous requests for admissions, in which NBC USA sought admissions from Gazelle Village regarding a variety of legal and factual issues. Due to a "regrettable oversight," Gazelle Village failed to timely respond to the requests for admissions. Thus, pursuant to Fed. R. Civ. P. 36(a), the matters are deemed admitted. Gazelle Village now moves to withdraw its admissions and serve late responses to NBC USA's requests.

Relying on Fed. R. Civ. P. 36(b), Gazelle Village argues that it should be allowed to withdraw its admissions because the presentation of the merits of the action will otherwise be subserved and NBC USA will not be prejudiced by maintaining its defense on the merits. NBC USA resists Gazelle Village's motion, arguing that Gazelle Village cannot meet the legal standard for amendment or withdrawal of admissions.

While not condoning the Gazelle Village's dilatory behavior, the court finds that allowing the admissions to stand would subserve the presentation of the merits, and that NBC USA will not be prejudiced by allowing the withdrawal. The deposition of Johnny Brown, President of Gazelle Village, was taken on March 8, 2005, after the admissions were "made" pursuant to Rule 36(a). A review of the deposition excerpts submitted in the parties' summary judgment appendices demonstrates that Brown was questioned in depth regarding all of the topics covered by the requests for admissions. Thus, NBC USA cannot demonstrate prejudice sufficient to prohibit the withdrawal. Gazelle Village's motion to withdraw its admissions and serve late responses is granted.

## SUMMARY JUDGMENT

A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. Kegel v. Runnels, 793 F.2d 924, 926 (8th Cir. 1986). Once the movant has properly supported its motion, the nonmovant "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "To preclude the entry of summary judgment, the nonmovant must show that, on an element essential to [its] case and on which it will bear the burden of proof at trial, there are genuine issues of material fact." Noll v. Petrovsky, 828 F.2d 461, 462 (8th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Although "direct proof is not required to create a jury question, . . . to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985) (quoting Impro Prod., Inc. v. Herrick, 715 F.2d 1267, 1272 (8th Cir. 1983)).

The nonmoving party is entitled to all reasonable inferences that can be drawn from the evidence without resort to speculation. Sprenger v. Fed. Home Loan Bank of Des Moines, 253 F.3d 1106, 1110 (8th Cir. 2001). The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. Id.

## STATEMENT OF MATERIAL FACTS[1]

On February 1, 2003, Johnny Brown ("Brown"), President of Gazelle Village, made a proposal to NBC USA to provide internet and computer sales services in

---

[1] Where disputed, the facts are taken in a light most favorable to Gazelle Village, as the nonmoving party.

connection with NBC USA's technology ministry, which is known by the acronym TOPIC. Bona fide Baptist churches become members of NBC USA by filling out an application form and paying a registration fee at NBC USA's annual session.

On March 20, 2003, Dr. Denise Mayhan, PhD, NBC USA's General Project Manager, Internet Ministries, wrote a letter to Brown which contained the following statements.

> The Convention may agree to take title of up to three (3) million computer systems during the 2003-2005 calendar years, provided certain conditions are met. . . . The Convention looks forward to enabling its 15,000+ member churches and their 7.5MM churchgoers and local communities to take part in educational opportunities made possible through computer technology and the Internet.

In April of 2003, Reverend Dr. William J. Shaw, President of NBC USA, communicated to Brown Dr. Shaw's idea that the cost of paying Gazelle Village for providing Internet services to "all registering member churches" would be covered through the $200 increase in the annual registration fee for member churches that had already been approved by NBC USA. On April 22, 2003, Dr. Denise Mayhan e-mailed Brown to inform him that "the NBC is having cash flow issues that are impacting their ability to continue with the computer/Internet ministry project beyond the month of April." Dr. Mayhan's e-mail further stated "[I] believe that the Convention could now really use the infusion of cash this program offers to enable it to serve its constituency by building their capacity for utilizing technology in education and ministry." Brown's responsive e-mail stated, in pertinent part, that Gazelle Village "would like to tithe the 10% of the ISP revenue added to our basic cost for members of the NBC."

On May 6, 2003, NBC USA informed Brown of its intent to enter into an agreement with Gazelle Village to develop and manage an ISP service branded for NBC USA. The letter confirming NBC USA's intent stated, in part, that NBC USA "[is] also working on completing the initial draft of the agreement for your review. We hope to have this

4

process completed by the end of next week." A May 16, 2003 letter from Dr. Shaw to Brown stated that "[o]ur attorneys are currently in the process of developing a formal agreement for your review for the ISP program. We hope to have this in your hands by May 30, 2003." NBC USA never provided a draft agreement to Brown for his review.

On June 3, 2003, NBC USA sent Brown a letter of understanding, in which NBC USA outlined the contractual elements for the basis of an agreement between Gazelle Village and NBC USA. The letter of understanding contained no reference to the term "registering member churches" or the notion that NBC USA intended to pay for internet service for its member churches. The letter does state, however, that "[i]t is [Dr. Shaw's] understanding that GVI will use this letter of understanding as the basis for developing a formal agreement, which will then be presented to the Convention for review and signature." The letter further states:

> The Convention agrees to the following contractual elements:
>
> 1.     GVI will:
>
>     a.     Develop and manage, on behalf of the Convention, a Convention-branded ISP that will carry the name "National Baptist Convention, USA, Inc."
>
>     d.     Secure the domain name "nbcusa.net" on behalf of the Convention;
>
>     j.     Allocate and transfer 10% of the gross monthly subscription revenues for subscribers who have signed up for service through the Convention's programs (set-up fees are explicitly excluded from the revenue calculations for this purpose)

On June 4, 2003, Brown provided NBC USA with an agreement for NBA USA under which Gazelle Village would provide internet-related services to NBC USA. On June 26, 2003, NBC received an invoice from Gazelle Village for $14,485 for services related to web hosting rendered by Gazelle Village. Included in this invoice was a $40.00 charge for "Domain Registration." NBC USA paid this invoice. NBC USA's intent to

5

develop the ISP program was announced at the National Baptist Congress meeting which took place on June 16-20, 2003.

On July 30, 2003, Reverend Dr. William J. Shaw, President of NBC USA, signed the above-referenced agreement, to be effective as of July 16, 2003. Attachment A to the agreement provides, in relevant part:

> 1. GVI will manage, on behalf of the Convention, a Convention-based ISP that would carry the name, "National Baptist Convention, USA, Inc." GVI agrees to:
>
>> b. Manage the domain name "nbcusa.net" on behalf of the Convention;
>>
>> e. Allocate and transfer prescribed tithing funds of the revenues collected from subscribers to the Convention's ISP, i.e., 10%; this is to be paid to the convention monthly. Checks or Wire transfer is due to the Convention on the first of each months.
>
> 2. The Convention agrees to [sic] for ISP Services
>
>> e. To collect from all registering member churches the GVI annual fee ($219.45/year/church) for ISP access to the Conventions [sic] Internet Ministry. Payments to GVI are due the 1st day of each month by check or wire transfer.
>>
>> f. Provide a data base of each paid member with the payment of funds (cut off to be the 25th of the preceding month for data base names captured).

The July 16, 2003 document does not contain any provisions specifically addressing the ownership of "nbcusa.net." Brown signed the document on behalf of Gazelle Village on August 3, 2003. Brown admits that the acronym of "NBC USA" in the domain name "nbcusa.net" stands for the National Baptist Convention, USA.

On August 25, 2003, Dr. Shaw sent Brown a letter, in which Dr. Shaw states that NBC USA and Gazelle Village intended different interpretations of the term "registering

6

member churches" contained in Attachment A, Section 2(e) of the July 16, 2003 document. Dr. Shaw's letter states that NBC USA "never intended to automatically register the Convention's member churches for ISP services, and ha[s] never represented such a claim verbally or in writing." Dr. Shaw's letter further states that "[g]iven this lack of mutual agreement, the contract Attachment (A) relating to ISP services must be considered null and void. . . ."

NBC USA did not receive any invoices from Gazelle Village for any services during the months of July and August of 2003. NBC USA did receive an invoice dated September 25, 2003 in the amount of $269,325 from Gazelle Village for three months of internet services for 4,500 churches. Gazelle Village agreed to void this invoice. Later, NBC USA received another invoice dated September 25, 2003 in the amount of $987,525 for an entire year of internet services for 4,500 churches.

On October 3, 2003, Brown e-mailed Antoinette Hodge of NBC USA requesting the names and number of churches who are "verified NBC USA, Inc. currently registered Churches from this year for 2004." Dr. Mayhan replied that Brown "will receive official church registration information from Dr. Shaw's office." Dr. Mayhan's responsive e-mail also addressed Gazelle Village's September 25, 2003 invoice, stating:

> This invoice references a number of churches that have registered at the Annual Session of the Convention that has not been validated in the Convention office. They are still in the process of discerning the exact number of churches registering at the higher registration fee level. Once the numbers have been validated, you will receive notification of this from Dr. Shaw's office and may proceed with billing at that time.
>
> Consequently, this invoice will be disregarded pending clarity on the correct number of churches and agreement on the number of Internet service to be paid for by the Convention and the number of free months offered by GVI.

An invoice dated December 24, 2003 was sent to NBC USA in the amount of $1,426,425 for 11 months of internet services for 6,500 churches. As of

December 31, 2003, Gazelle Village had sold only seven computers and signed up four individuals for internet services. Brown has admitted that Gazelle Village provided internet services to "maybe two" member churches of NBC USA.

On February 3, 2004, the NBC USA provided its 30 days written notice of its intent to terminate its agreement with Gazelle Village.

## CONCLUSIONS OF LAW

### Breach of Contract

NBC USA contends that it is entitled to summary judgment on Gazelle Village's breach of contract claim because the undisputed facts establish that, as a matter of law, there was no "meeting of the minds" regarding the term "registering member churches" and thus, no contract.[2] NBC USA argues that it never intended the term "registering member churches" to mean that it - a non-profit corporation - would pay for ISP services for all of its 6,500 members. Rather, NBC USA claims that it understood the agreement to mean that the members of the Convention that wanted internet service could register and pay for it through the Convention and thereby receive reduced rates for that service from Gazelle Village. NBC USA contends that the term "registering member churches" is ambiguous and must, as a matter of law, be construed against Gazelle Village as the drafter of the document.

Gazelle Village resists NBC USA's motion for summary judgment, arguing that NBC USA has judicially admitted the existence of a binding contract between the parties. Gazelle Village further argues that the parties' dispute over the phrase "all registering member churches" is one of interpretation, not mutual assent, and that the interpretation of the phrase is reserved for the trier of fact, thus precluding summary judgment. Finally,

---

[2]Throughout its moving papers NBC USA uses the term "registering church members" whereas the July 16, 2003 document uses the phrase "registering member churches." The court will use the terminology as set forth in the document.

8

Gazelle Village argues that the extrinsic evidence does not support NBC USA's interpretation of the contract.

"For a contract to be valid, the parties must express mutual assent to the terms of the contract." Schaer v. Webster County, 644 N.W.2d 327, 338 (Iowa 2002) (citations omitted). If the parties misunderstand the language relating to the object of the agreement such that "one party [understands] [it] is buying one thing and the other party thinks [it] is buying another thing, no meeting of the minds occurs, and no contract is formed." Id. However, it is objective evidence and not the hidden intent of the parties from which mutual assent is determined. Id. "The misunderstandings of the parties must be reasonable under the circumstances to support a finding of a lack of mutual assent." Id. See also Fairway Center Corp. v. U.I.P. Corp., 502 F.2d 1135, 1141 (8th Cir. 1974) ("Whether or not there has been such mutual assent depends on the intention of the parties as determined objectively from their words and actions viewed within the context of the situation and surrounding circumstances."); Wells Fargo Fin. Leasing, Inc. v. LMT Fette, Inc., 382 F.3d 852, 857 (8th Cir. 2004) (same). However, "[a] unilateral mistake by one party will not release that party from its obligations under the contract." Employers Mut. Casualty Co. v. United Fire & Casualty Co., 682 N.W.2d 452, 454 (Iowa Ct. App. 2004) (citing State v. Unisys Corp., 637 N.W.2d 142, 150 (Iowa 2001)).

Under Iowa law, the cardinal rule of contract interpretation is that the parties' intent controls. DeJong v. Sioux Center, Iowa, 168 F.3d 1115, 1119 (8th Cir. 1999). See also Walsh v. Nelson, 622 N.W.2d 499, 503 (Iowa 2001) ("The primary goal of contract interpretation is to determine the parties' intentions at the time they executed the contract."). "The intent may be 'determined from the terms of the [contract], what is necessarily implied from the terms, and the circumstances surrounding the formation and execution of the [contract].'" DeJong, 168 F.3d at 1119 (quoting Dickson v. Hubbell Realty Co., 567 N.W.2d 427, 430 (Iowa 1997)).

Contract interpretation involves two steps. First, the court must determine, from the words chosen, "what meanings are reasonably possible." Walsh, 622 N.W.2d at 503 (quoting Restatement (Second) of Contracts, § 202 cmt. a, at 87 (1981)). "In do doing, the court determines whether a disputed term is ambiguous." Id.

A contract term is "ambiguous" if, "after the application of rules of interpretation to the fact of the contract, a genuine uncertainty exists concerning which of two reasonable meanings is proper." DeJong, 168 F.3d at 1119 (citing Service Unlimited, Inc. v. Elder, 542 N.W.2d 855, 857 (Iowa Ct. app. 1995)). The test in determining ambiguity is objective, i.e., "whether the language is fairly susceptible to two interpretations." Id. (citing Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents, 471 N.W.2d 859, 863 (Iowa 1991)). "In other words, a contract term is ambiguous if, looking at the contract as a whole, it can reasonably support more than one meaning." Id. See also Walsh, 622 N.W.2d at 503 ("A term is ambiguous if, 'after all pertinent rules of interpretation have been considered,' 'a genuine uncertainty exists concerning which of two reasonable interpretations is proper.'") (quoting Hartig Drug Co. v. Hartig, 602 N.W.2d 794, 707 (Iowa 1999)). A term is not ambiguous simply because the parties disagree as to its meaning. Id.

If a term is found to be ambiguous, the court must then "choose among possible meanings." Id. (quoting Restatement (Second) of Contracts § 202 cmt. a, at 87). Extraneous evidence is then admissible to aid in the interpretation of the contract. DeJong, 168 F.3d at 1121. "If the resolution of ambiguous language involved extrinsic evidence, a question of interpretation arises which is reserved for the trier of fact." Walsh, 622 N.W.2d at 503 (citing Fausel v. JRJ Enters., Inc., 603 N.W.2d 612, 618 (Iowa 1999)). See also Iowa-Des Moines Nat'l Bank v. Ins. Co. of North America, 459 F.2d 650, 654 (8th Cir. 1972) ("If [the extrinsic] evidence is conflicting it should be resolved by a jury.").

"The first rule of interpretation is to examine the plain meaning of the term." DeJong, 168 F.3d at 1120. Further, it is "well established that contracts should be interpreted as a whole, and contractual terms should be interpreted in the context in which they are used rather than in isolation." Id. "Another, well-established rule of contract interpretation is that an 'interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.'" Id. (quoting Fashion Fabrics of Iowa, Inc. v. Retail Investors Corp., 266 N.W.2d 22, 26 (Iowa 1978)). "In Iowa, interpretation of contractual terms is an issue for the court unless it turns on extrinsic evidence or a choice among reasonable inferences." Id. at 1121 (citing Iowa-Illinois Gas & Elec. Co. v. Black & Veatch, 497 N.W.2d 821, 825 (Iowa 1993)).

The court cannot, as a matter of law and based upon the record provided, determine that there was no meeting of the minds and, therefore, no contract. The court also rejects Gazelle Village's argument that NBC USA has judicially admitted the existence of a contract, which is a legal question. See National Surety Corp. v. Ranger Ins. Co., 260 F.3d 881, 886 (8th Cir. 2001) ("[F]actual statements in a party's pleading are generally binding on that party unless the pleading is amended."). The objective evidence both supports and undermines the parties' respective interpretations of "all registering member churches," which the court finds to be ambiguous. Extrinsic evidence will be needed to resolve this matter, making it improper for summary disposition.

The court declines at this juncture to construe this term strictly against Gazelle Village because, while Gazelle Village may have technically prepared the agreement which was ultimately signed, it did so at NBC USA's request, after NBC USA failed to have the agreement drafted by its attorneys as promised, and the agreement was based in large part on documents prepared by Dr. Mayhan on behalf of NBC USA. Further, if the record developed at trial demonstrates that NBC USA had their attorneys involved in reviewing

11

and approving the agreement, then this rule of contract law may not apply. See DeJong, 168 F.3d at 1121 (citing Kinney v. Capitol-Strauss, Inc., 207 N.W.2d 574 (Iowa 1973)).

Whereas NBC USA may not have intended that all churches that registered for membership at the annual session would automatically be registered for ISP service through Gazelle Village, the correspondence leading up to the annual session discuss NBC USA's possible procurement of three million computers for its constituents. Further, Dr. Mayhan's response to Gazelle Village's September 2003 invoice in the amount of $987,525 raises questions regarding "higher registration fee level" which is not adequately explained, i.e., was it charged to all churches who registered at the annual session, or only those who opted to get ISP service through Gazelle Village. Finally, the court finds that the resolution of this dispute will ultimately involve credibility determinations, which cannot be made on summary judgment.

## Ownership of Domain Name

NBC USA moves for summary judgment on its counterclaim relating to the ownership of the domain name "nbcusa.net" and Gazelle Village's refusal to provide NBC USA with the administrator sign-in name and passcode. NBC USA argues that the undisputed evidence establishes that it paid Gazelle Village $40.00 for the registration of the domain name, that the July 16, 2003 document does not entrust Gazelle Village with the domain name, but instead provides that Gazelle Village will "[s]ecure the domain name 'nbcusa.net' on behalf of the Convention." Brown has admitted that nbcusa.net stands for the National Baptist Convention, USA[3].

Gazelle Village resists NBC USA's motion, arguing that the $40.00 fee charged to NBC USA was for the domain name to be on Gazelle Village's web-hosting servers. Gazelle Village also argues that the price charged by Network Solutions, LLC for

---

[3]The court will not address NBC USA's trademark law analogy as there was no such claim brought by NBC USA and the court finds the analogy to be marginally relevant.

registering a domain name for a three-year period is $24.99 per year, which means that NBC USA would have paid either $24.99 for one year or $74.97 for three years, not $40.00. Gazelle Village contends that it bought and registered the domain name, and therefore owns the domain name.

NBC USA replies to Gazelle Village's argument by pointing out that the Network Solutions, LLC document relied upon for the applicable prices were the prices in effect as of April 30, 2005, which is more than two years after the relevant time frame.

According to Gazelle Village's June 26, 2003 invoice, the $40.00 fee in question was for "Domain Registration." The July 16, 2003 document provides that Gazelle Village will "[m]anage the domain name 'nbcusa.net' <u>on behalf of the Convention.</u>" Gazelle Village's attempt to re-characterize this aspect of the agreement at this juncture is suspect at best. Nonetheless, as a trial will be necessary to determine whether there was a "meeting of the minds" regarding the term "all registering member churches," the court will resolve this issue following trial as well.

Upon the foregoing,

IT IS ORDERED that defendant's motion for summary judgment (docket number 24) is denied. Plaintiff's motion to withdraw admissions (docket number 28) is granted. A telephonic scheduling conference to select a trial date is set for 11:30 a.m. on June 27, 2005. The call will originate from the undersigned's chambers, United States District Courthouse, Cedar Rapids, Iowa.

June 17, 2005.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT