# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| GAZELLE VILLAGE, INC., | |
| Plaintiff, | No. C04-0016 |
| vs. | **ORDER** |
| NATIONAL BAPTIST CONVENTION USA, INC., | |
| Defendant. | |

This matter comes before the court pursuant to a two-day bench trial which commenced on September 26, 2005. The parties consented to jurisdiction before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The court finds in favor of the defendant.

## NATURE OF THE CASE

The plaintiff, Gazelle Village, Inc., ("GVI") claims that the defendant, National Baptist Convention USA, Inc., ("NBC") breached its contract with the GVI, under which GVI was to provide internet service to "all registering member churches" of NBC. NBC moved for summary judgment on GVI's claim, arguing that the undisputed facts established, as a matter of law, that there was no "meeting of the minds" regarding the term "registering member churches" and thus, no contract existed. NBC further argued that it was entitled to summary judgment on its counterclaim that it was GVI who breached the contract by refusing to transfer the domain name "nbcusa.net" back to NBC, along with the sign-in name and pass-code, upon the termination of the contract. NBC also seeks declaratory judgment on various issues relating to the contract. NBC motion for summary judgment was denied on June 16, 2005. In so denying NBC's motion, the court found that

1

the key contract term was ambiguous and would require extrinsic evidence to properly interpret the contract. The court further found that determining whether there was, in fact, a "meeting of the minds" with respect to the contract would require credibility determinations, which could not be resolved on motions for summary judgment. Having received such evidence in the bench trial, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

GVI is an Iowa corporation, which was founded in August of 2000. Johnny Brown ("Brown") is the president of GVI. Brown is also a deacon in the Mt. Zion Missionary Baptist Church, where his pastor is Reverend Lonnie Jordan. Mt. Zion is a member of the NBC. Pastor Jordan is a NBC board member. Pastor Jordan first learned that the NBC was interested in starting an internet-based ministry at the 2002 board meeting, which was held in Nashville, TN. Pastor Jordan knew that Brown's business, GVI, provided these kind of services and told Brown of NBC's plans. The following year, Brown attended the NBC's convention with Pastor Jordan and Pastor Jordan introduced Brown to Dr. Alvin Love, Chairman of NBC's internet ministry program, TOPIC (turned on and plugged in for Christ).

The NBC is an associational body of Baptist churches that focus on common objectives, such as missions and education. Dr. William J. Shaw is the current President of the NBC and held that position at all times relevant to this lawsuit. Dr. Shaw has also served as the Pastor for White Rock Baptist Church in Philadelphia for approximately 49 years. Churches become members of the NBC by filling out an application form and paying a registration fee at the NBC's annual session. Prior to 2003, the minimum membership fee was $200.00. In January of 2003, the NBC Board of Directors passed a resolution recommending that the minimum registration fee be increased to $400.00. This increase was not mandatory, but rather, the members were asked to voluntarily register at

this higher rate. Paying the minimum registration fee allows the members to receive the materials that are distributed by the NBC in the registration delegates' kit, and it confers voting privileges.

On February 1, 2003, Brown made a proposal to the NBC to provide internet and computer sales services in connection with NBC's TOPIC program. See Exhibit 9. The NBC had hired Dr. Denise Mayhan and her company, Inspired Solutions, to develop the TOPIC ministry. Inspired Solutions is a management education and technology consulting company. Dr. Mayhan's company works primarily on the content development and management for websites, E-learning programs, and management consultation. With respect to the NBC's TOPIC ministry, Dr. Mayhan's duties as Project Manager were to initiate the entire ministry, set its structure, and get it started for the NBC. Dr. Mayhan had no authority either to negotiate with vendors or to sign contracts on behalf of the NBC. Dr. Mayhan reported to Dr. Shaw.

On March 20, 2003, Dr. Mayhan wrote a "letter of interest" to Brown which contained the following statements.

> The Convention may agree to take title of up to three (3) million computer systems during the 2003-2005 calendar years, provided certain conditions are met. . . . The Convention looks forward to enabling its 15,000+ member churches and their 7.5MM churchgoers and local communities to take part in educational opportunities made possible through computer technology and the Internet.

See Exhibit 12.

On April 22, 2003, Dr. Mayhan e-mailed Brown to inform him that "the NBC is having cash flow issues that are impacting their ability to continue with the computer/Internet ministry project beyond the month of April." See Exhibit D. Dr. Mayhan's e-mail further stated "[I] believe that the Convention could now really use the infusion of cash this program offers to enable it to serve its constituency by building their capacity for utilizing technology in education and ministry." Id. Brown's responsive

e-mail stated, in pertinent part, that Gazelle Village "would like to tithe the 10% of the ISP revenue added to our basic cost for members of the NBC." Id. Brown's e-mail further provided that "unless NBC no longer wants to have the Internet Ministry all together, doing it at no cost and only income for the NBC is the best I can offer." Id.

In April 26, 2003, Brown met personally with Dr. Shaw, in Dr. Shaw's office in Philadelphia, to discuss GVI's potential involvement in NBC's TOPIC ministry. Dr. Mayhan participated in the meeting by telephone. Brown testified that at this meeting Dr. Shaw suggested that the $200.00 dues increase could be used to finance the ISP services. Both Dr. Shaw and Dr. Mayhan deny that this representation was ever made. At trial, Dr. Shaw testified that there were several reasons why he never would have made such a representation. First, the NBC had no authority to obligate the individual member churches to become part of the TOPIC internet ministry. According to Dr. Shaw, the nature of the Baptist church is that there is no formal connection among the churches, but rather that each congregation is an autonomous body. Second, Dr. Shaw said that it would be fiscally irresponsible for the NBC to commit to this kind of liability on behalf of churches who may not even want or need ISP services.

On May 6, 2003, NBC informed Brown of its intent to enter into an agreement with GVI to develop and manage an ISP service branded for NBC. See Exhibit 13. The letter confirming NBC's intent stated, in part, that NBC "[is] also working on completing the initial draft of the agreement for your review. We hope to have this process completed by the end of next week." Id. A May 16, 2003 letter from Dr. Shaw to Brown stated that "[o]ur attorneys are currently in the process of developing a formal agreement for your review for the ISP program. We hope to have this in your hands by May 30,2003." See Exhibit 14. The NBC never provided a draft agreement to Brown for his review.

On June 3, 2003, the NBC sent Brown a "letter of understanding," in which the NBC outlined the contractual elements for the basis of an agreement between GVI and the NBC. See Exhibit 16; K. This letter of understanding contains no reference to the term

4

"registering member churches" or the notion that the NBC intended to pay for internet service for its member churches. The letter does state, however, that "[i]t is [Dr. Shaw's] understanding that GVI will use this letter of understanding as the basis for developing a formal agreement, which will then be presented to the Convention for review and signature." Id. The letter further states:

> The Convention agrees to the following contractual elements:
> 
> 1. GVI will:
> 
>    a. Develop and manage, on behalf of the Convention, a Convention-branded ISP that will carry the name "National Baptist Convention, USA, Inc."
> 
>    d. Secure the domain name "nbcusa.net" on behalf of the Convention;
> 
>    j. Allocate and transfer 10% of the gross monthly subscription revenues for subscribers who have signed up for service through the Convention's programs (set-up fees are explicitly excluded from the revenue calculations for this purpose)

Id.

On June 4, 2003, Brown provided the NBC with an agreement for NBC under which GVI would provide internet-related services to the NBC. See Exhibit N. On June 26, 2003, the NBC received an invoice from Gazelle Village for $14,485 for services related to web hosting provided by GVI. Included in this invoice was a $40.00 charge for "Domain Registration." The NBC paid this invoice. The NBC's intent to develop the ISP program was announced at the National Baptist Congress meeting which took place on June 16-20, 2003 in Detroit, MI.

On July 1, 2003 Brown sent Dr. Shaw a letter which stated, in pertinent part:

> As one of the first tools to set in motion to the participation of the churches and its members, it would be beneficial to begin regular notification of the churches alerting them of the registration fees (including this service as part of the

registration fee or adding some portion to the registration fee) for the NBCUSA.net ISO Internet Ministry availability before the September 2003 Convention.

See Exhibit 17.

On July 30, 2003, Dr. Shaw signed a "contract for acquisition of internet services" to be effective as of July 16, 2003. See Exhibit 2; R. Attachment A to the agreement provides, in relevant part:

> 1. GVI will manage, on behalf of the Convention, a Convention-based ISP that would carry the name, "National Baptist Convention, USA, Inc." GVI agrees to:
>
>> b. Manage the domain name "nbcusa.net" on behalf of the Convention;
>>
>> e. Allocate and transfer prescribed tithing funds of the revenues collected from subscribers to the Convention's ISP, i.e., 10%; this is to be paid to the convention monthly. Checks or Wire transfer is due to the Convention on the first of each months.
>
> 2. The Convention agrees to [sic] for ISP Services
>
>> e. To collect from all registering member churches the GVI annual fee ($219.45/year/church) for ISP access to the Conventions [sic] Internet Ministry. Payments to GVI are due the 1st day of each month by check or wire transfer.
>>
>> f. Provide a data base of each paid member with the payment of funds (cut off to be the 25th of the preceding month for data base names captured).

Id.

The July 16, 2003 document does not contain any provisions specifically addressing the ownership of "nbcusa.net." Dr. Mayhan testified that GVI registered "nbcusa.net" on behalf of the NBC and at her request. Brown signed the document on behalf of Gazelle

6

Village on August 3, 2003. Brown admits that the acronym of "NBC" in the domain name "nbcusa.net" stands for the National Baptist Convention, USA.

On August 25, 2003, Dr. Shaw sent Brown a letter, in which Dr. Shaw states that NBC and Gazelle Village intended different interpretations of the term "registering member churches" contained in Attachment A, Section 2(e) of the July 16, 2003 document. See Exhibit 23; T. Dr. Shaw's letter states that NBC "never intended to automatically register the Convention's member churches for ISP services, and ha[s] never represented such a claim verbally or in writing." Dr. Shaw's letter further states that "[g]iven this lack of mutual agreement, the contract Attachment (A) relating to ISP services must be considered null and void. . . ." Dr. Shaw, Dr. Mayhan, and Dr. Love all testified at trial that they interpreted Section 2(e) to mean that the individual churches who wished to register for GVI's internet service at the same time that they were registering for NBC membership would pay an additional $219.45. NBC would collect this money and forward it to GVI, along with that church's data so that GVI could sign them up for internet service. GVI would then tithe back to the NBC 10% of all of the monies received by GVI. According to Brown, Section 2(e) meant that the NBC was to deduct $219.45 for each church registering at the $400.00 level and pay that money to GVI. GVI would then tithe back 10% to the NBC.

The NBC did not receive any invoices from GVI for any services during the months of July and August of 2003. The NBC did receive an invoice dated September 25, 2003 in the amount of $269,325 from Gazelle Village for three months of internet services for 4,500 churches. Gazelle Village agreed to void this invoice. Later, the NBC received another invoice dated September 25, 2003 in the amount of $987,525 for an entire year of internet services for 4,500 churches.

An invoice dated December 24, 2003 was sent to the NBC in the amount of $1,426,425 for 11 months of internet services for 6,500 churches. On February 3, 2004, the NBC provided 30 days written notice of its intent to terminate its agreement with GVI.

7

See Exhibit 48. To date, GVI has provided no internet services to any member churches of the NBC. Brown testified that this is because the NBC never paid as it agreed and the services were to be prepaid, i.e., the NBC did not pay GVI so the churches did not get their free internet access. The parties attempted to negotiate a resolution to this matter, as required by the contract, but such efforts were unsuccessful.

## CONCLUSIONS OF LAW
### Breach of Contract

"For a contract to be valid, the parties must express mutual assent to the terms of the contract." Schaer v. Webster County, 644 N.W.2d 327, 338 (Iowa 2002) (citations omitted). If the parties misunderstand the language relating to the object of the agreement such that "one party [understands] [it] is buying one thing and the other party thinks [it] is buying another thing, no meeting of the minds occurs, and no contract is formed." Id. However, it is objective evidence and not the hidden intent of the parties from which mutual assent is determined. Id. "The misunderstandings of the parties must be reasonable under the circumstances to support a finding of a lack of mutual assent." Id. See also Fairway Center Corp. v. U.I.P. Corp., 502 F.2d 1135, 1141 (8th Cir. 1974) ("Whether or not there has been such mutual assent depends on the intention of the parties as determined objectively from their words and actions viewed within the context of the situation and surrounding circumstances."); Wells Fargo Fin. Leasing, Inc. v. LMT Fette, Inc., 382 F.3d 852, 857 (8th Cir. 2004) (same). However, "[a] unilateral mistake by one party will not release that party from its obligations under the contract." Employers Mut. Casualty Co. v. United Fire & Casualty Co., 682 N.W.2d 452, 454 (Iowa Ct. App. 2004) (citing State v. Unisys Corp., 637 N.W.2d 142, 150 (Iowa 2001)).

Under Iowa law, the cardinal rule of contract interpretation is that the parties' intent controls. DeJong v. Sioux Center, Iowa, 168 F.3d 1115, 1119 (8th Cir. 1999). See also Walsh v. Nelson, 622 N.W.2d 499, 503 (Iowa 2001) ("The primary goal of contract

8

interpretation is to determine the parties' intentions at the time they executed the contract."). "The intent may be 'determined from the terms of the [contract], what is necessarily implied from the terms, and the circumstances surrounding the formation and execution of the [contract].'" DeJong, 168 F.3d at 1119 (quoting Dickson v. Hubbell Realty Co., 567 N.W.2d 427, 430 (Iowa 1997)).

Contract interpretation involves two steps. First, the court must determine, from the words chosen, "what meanings are reasonably possible." Walsh, 622 N.W.2d at 503 (quoting Restatement (Second) of Contracts, § 202 cmt. a, at 87 (1981)). "In do doing, the court determines whether a disputed term is ambiguous." Id.

A contract term is "ambiguous" if, "after the application of rules of interpretation to the fact of the contract, a genuine uncertainty exists concerning which of two reasonable meanings is proper." DeJong, 168 F.3d at 1119 (citing Service Unlimited, Inc. v. Elder, 542 N.W.2d 855, 857 (Iowa Ct. app. 1995)). The test in determining ambiguity is objective, i.e., "whether the language is fairly susceptible to two interpretations." Id. (citing Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents, 471 N.W.2d 859, 863 (Iowa 1991)). "In other words, a contract term is ambiguous if, looking at the contract as a whole, it can reasonably support more than one meaning." Id. See also Walsh, 622 N.W.2d at 503 ("A term is ambiguous if, 'after all pertinent rules of interpretation have been considered,' 'a genuine uncertainty exists concerning which of two reasonable interpretations is proper.'") (quoting Hartig Drug Co. v. Hartig, 602 N.W.2d 794, 707 (Iowa 1999)). A term is not ambiguous simply because the parties disagree as to its meaning. Id.

If a term is found to be ambiguous, the court must then "choose among possible meanings." Id. (quoting Restatement (Second) of Contracts § 202 cmt. a, at 87). Extraneous evidence is then admissible to aid in the interpretation of the contract. DeJong, 168 F.3d at 1121. "If the resolution of ambiguous language involved extrinsic evidence, a question of interpretation arises which is reserved for the trier of fact." Walsh, 622

N.W.2d at 503 (citing Fausel v. JRJ Enters., Inc., 603 N.W.2d 612, 618 (Iowa 1999)). See also Iowa-Des Moines Nat'l Bank v. Ins. Co. of North America, 459 F.2d 650, 654 (8th Cir. 1972) ("If [the extrinsic] evidence is conflicting it should be resolved by a jury.").

After hearing the testimony and reviewing the exhibits, the court finds that the plaintiff has not proven, by the preponderance of the evidence, that there was a meeting of the minds here. Section 2(e) of attachment "A" to the July 2003 agreement provides that the NBC shall "collect from all registering member churches the GVI annual fee ($219.45/year/church) for ISP access to the Conventions [sic] Internet Ministry. Payments to GVI are due the 1st day of each month by check or wire transfer." See Exhibit 2. The court had previously found the term "registering member churches" to be ambiguous. Brown argues that "registering member churches" means all churches who registered to become members of the NBC. According to Brown, the contract obligated the NBC to pay GVI $219.45 for each church that registered to be a member of the NBC. The NBC contends that the term means that it would collect the $219.45 from all "member churches" who wished to "register" for GVI's internet service and forward that money to GVI. The court finds that all of the testimony on this issue was sincere and credible, thereby demonstrating that the parties' intent was not in sync and that there was no meeting of the minds.

The circumstances surrounding the formation and execution of this contract support the court's conclusion that the parties' had differing intents and that there was no meeting of the minds. With respect to Brown, the evidence demonstrated that he was very zealous and passionate in his pursuit of this project, e.g., the elaborate booth for the conventions, ordering 10,000 start-up CDs, etc. Regarding the NBC, however, the court finds persuasive Dr. Shaw's testimony as to why he and/or the NBC never would have agreed to the contract as interpreted by Brown. First, the NBC has no power to mandate that its churches even sign up for GVI's internet service. Second, neither Brown nor the NBC

knew how many churches actually had computers, web sites, or even desired internet services. Third, the NBC was in a precarious financial situation at the time, making it extremely unlikely that the NBC would commit to this kind of liability, i.e., commit to pay $219.45 to GVI when it only raised its dues $200.00. Brown acknowledged the NBC's financial situation when he offered his internet services at "no cost and only income" for the NBC. Finally, no one pays for internet service a year in advance. Judgment will enter in favor of the NBC on Brown's breach of contract claim.[1] The NBC's breach of contract counterclaim (Count I) must fail, however, as no evidence was presented demonstrating the NBC's damages resulting from GVI's alleged breaches.

## Ownership of Domain Name

Count I of NBC's counterclaim (declaratory judgment) relates to the ownership of the domain name "nbcusa.net" and GVI's refusal to provide NBC with the administrator sign-in name and passcode. NBC argues that it paid Gazelle Village $40.00 for the registration of the domain name, that the July 16, 2003 document does not give GVI ownership of the domain name, but instead provides that GVI will "[s]ecure the domain name 'nbcusa.net' on behalf of the Convention." Brown has admitted that nbcusa.net stands for the National Baptist Convention, USA.

The July 16, 2003 agreement provides that GVI will "[m]anage the domain name 'nbcusa.net' on behalf of the Convention." See Exhibit 2 (emphasis added). The court finds and declares that the GVI shall, within 10 days of the date of this order, forward to Dr. Shaw the account administrator sign-in name and pass-code for the domain name "nbcusa.net." GVI shall immediately cease publishing the "nbcusa.net" website. Further, GVI shall immediately cease and desist any and all solicitations of the NBC's members which suggest that GVI continues to operate in partnership with the NBC. GVI shall return to the NBC the NBC's mailing list of member churches.

---

[1] Such a finding renders moot the NBC's claim for rescission fo the contract due to GVI's fraudulent misrepresentations (Count III of the NBC's counterclaim).

## CONCLUSION

As set forth above, **IT IS ORDERED** that judgment enter against GVI and in favor of the NBC on GVI's breach of contract claims (Counts I and II). GVI shall recover nothing. Regarding Count I of the NBC's counterclaim (seeking declaratory judgment) the court declares as follows: (1) GVI shall, within 10 days of the date of this order, forward to Dr. Shaw the account administrator sign-in name and pass-code for the domain name "nbcusa.net"; (2) GVI shall immediately cease publishing the "nbcusa.net" website; (3) GVI shall immediately cease and desist any and all solicitations of the NBC's members which suggest that GVI continues to operate in partnership with the NBC; and (4) GVI shall immediately return to the NBC the NBC's mailing list of member churches. With respect to Count II of the NBC's counterclaim (breach of contract), the court hereby dismisses such claim as no evidence has been produced demonstrating any damage to the NBC as a result of GVI's alleged breaches. Count III of the NBC's counterclaim, which seeks rescission of the contract due to GVI's alleged fraudulent misrepresentation is rendered moot by the fact that the court found in NBC's favor on GVI's contract claim.

March 31, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT